All right, 23-8073, Wildcat Coal v. Pacific Minerals. Mr. Young? Yes. Thank you, Your Honor. May it please the Court. Josh Young for the appellants, which I'll call Bridger. I'd like to reserve three minutes for rebuttal. The district court committed several serious errors in granting Wildcat summary judgment and awarding it a $20 million advance royalty in this coal mining lease case. The plain language of the applicable nine-mile lease, together with the undisputed surrounding circumstances, preclude any advance royalty and call for reversing the judgment below. So it sounds like you want to discuss this case sort of, in New Mexico, we would call it the contextual approach to contract interpretation. Yes, Your Honor. Although we have very strong plain language arguments that would allow us to prevail without looking to the context. But the context outside of the contract also supports our plain language reading and confirms it.  So to get to the context, would we have to have a determination that the plain language contains some type of ambiguity, or that it was unclear in some way? No, not under Wyoming law. Wyoming law provides that surrounding circumstances can be examined, even in circumstances where the language or particular provision is clear and unambiguous. Cases like Hickman, Ecosystems, and M&M Auto all point in that direction. And before you move on, would you give us just a background? So how has the progress of mining this coal mine progressed over the years? Did it start in the nine-mile area and move away from it? Is that what's happened out there? Yes, more or less. So mining began in 1969 under a prior lease. This is back when it was Union Pacific and Pacific Minerals. And then in 1986, they restated the lease. All this while, the nine-mile lands and the adjoining government lands in what's called the nine-mile draw were being mined. And that continued after 1986. And in the early years of the 1986 lease, most of the bulk of the mining was done on the private RSRC or Anadarko-owned lands in that nine-mile draw. And that's how the sort of large credit accrued in those early years of the 1986 lease. And then by the time you get to the 2000 time frame, most of the coal has been mined out of those areas. I shouldn't say most of it. Largely it hasn't. They're ready to move beyond the original borders. And so then they look to the north and consider the 10-mile lease. But because of the depth of the coal seam, they determine that that needs to be underground. And very tellingly, they don't proceed then to the nine-mile lease. The parties conclude that they need to enter a new lease to authorize underground mining, even on the areas that were within the nine-mile lease area, because some of those areas ended up being underground mined. So if we did an overlay of the 10-mile lease and the nine-mile lease, there would be some overlap. Yes, that's absolutely right. You can see that in the map at the end of the addendum in that sort of northwest portion, there is some cross-hatching. And that is what indicates that there is overlap. This would be addendum page 89. Should I move on? You're on yours? Okay, sorry. Okay, so I'd like to start, unless your honors would prefer me to start somewhere else, with the district court's refusal to apply the protest period provision in section 6D of the nine-mile lease. Under that provision, which you can see at addendum pages 49 and 50, royalty payments and supporting accountings and statements must be conclusively presumed true and correct, if not protested, within three years. From the commencement of the lease through 2020, Bridger consistently paid production royalties, but no advance royalties. It consistently provided coal production data for the Bridger mine that included all of the parts of it. And, excuse me, RSRC and Anadarko never protested. So in the data that they were providing, so say from 1986 to 1991, if I looked at that, would I be able to tell how much came out of the nine-mile lease and how much came from outside of the nine-mile lease? Yes, I mean, in 1986, it would have only been the government lands and the private lands within the nine-mile lease. It wasn't until the 2000s that you start to see other private lands being mined. I got you, so when the lease, the nine-mile lease was consummated, you had the nine-mile fee lands, and then the royalty agreement had to do with what happened if they mined out of the federal and state permits. At that time, there were no additional private leases. That's correct, Your Honor. And in fact, in 1987, or I'm sorry, 1997, when they wanted to add some lands, they added them to the Rock Springs lands under the nine-mile lease by amendment. So that was the process, and then they got to the 10-mile lease, and for reasons I explained, they did a separate lease. But since you never paid an advanced royalty, there was really never an occasion for Wildcat to examine the books. You just offered the royalty. They could have protested or examined, they didn't, but you never offered an advanced royalty, so there was no reason for them to examine the underlying legitimacy of that payment. Well, there was, Your Honor, because there is this credit accruing, and the credit depends on how much is coming from adjoining lands. And so it was very much in RSRC and Anadarko's interest to object if our accounting of the coal production coming from adjoining lands was incorrect. Well, this credit accruing idea, though, never came up until basically this dispute, did it? Because your client paid a 45%, in lieu of royalty, let's call it, because they, and they weren't even considering the fact that there could have been a credit accruing in the past at that time. Isn't that right? Well, there was a mistake made by the person who initially calculated that in 2001. I mean, they didn't, I mean, they were your client. I mean, they didn't apply a credit that accrued back to 1986. Well, when they first calculated it, the person who did it, he made a mistake, and he did not accrue it. When the issue was revisited as the party discussed the issue, our client concluded that it was appropriate to apply the credit, and then did apply the credit. To go back, the lawyer. I mean, you see the issue with that, though. Well, you want to criticize them for not complaining that the credit was calculated wrong in the past when, I mean, the only time it was ever even looked at, many years later, your client didn't even consider the fact that there was a credit, and you call it a mistake. I mean, for whatever reason, they didn't consider it. Did you have, if we looked at some discovery of some sort, would we see in your client's books this credit being carried forward all these years? Or was that determined, was that calculated after the erroneous payment? The record doesn't reveal a calculation of the sort that you're talking about, Your Honor, but I'd like to make two points about that. The first is that the protest period provision does not depend on whether one of the parties made a mistake or didn't make a mistake. In fact, exists to close off disputes about whether there was a mistake made in the past. That's fine. I mean, does the protest period apply to your client as well? Yes, it does. Okay, so if there was, if they didn't assert a credit in the past, then they lose that credit going forward because they didn't... There's no evidence that the credit wasn't asserted in the past. But there's no evidence that it was. Well, there is the evidence, though, that is crucial, which is that the parties always treated the adjoining lands as being limited to government surface-mined lands and that Anadarko and RSRC received this data about how much was coming from adjoining lands. They audited that data and they discussed it with Bridger and they never protested the amount that Bridger was attributing to adjoining lands. Did you actually, every five years, do this calculation? And when you say they had the data, did you provide them with the calculation every five years on the advance royalty and say, here's the calculation, here's how we determined it, and by the way, we don't owe you any advance royalty? Did they have that? Right, so the way it worked in practice, and you can see this in the affidavits and declarations, is that in the auditing process, they reviewed whether, within the five-year period, the 45% threshold was satisfied. Who's they? Bridger and Anadarko, both. And they both concluded, for each five-year period, that the 45% threshold had been satisfied. As a result, if it's satisfied for every five-year period, it's necessarily satisfied over the course of the lease and therefore, no advance royalty would be due. So what you're saying is, in order for them to agree, they would have had to have been in agreement on what adjoining lands consisted of. Yes, and that's what's- It doesn't really have anything to do with whether there's a credit or not. They had to be in agreement about figures or the calculations that were going into that equation. That's right, right. You don't need to get to the credit. The credit never needed to be calculated at that point. What matters, for purposes of the conclusive presumption, is that they received the underlying data from all of these different sections and they reached a conclusion that the adjoining lands were the- Did they really receive data or did they just receive a statement from Bridger saying no advance royalties due and they trusted that representation? No, they received the data- The underlying mining data? Yes, and they audited it and that's also in the affidavits and declarations. I see that I'm into my rebuttal time, your honors. Let me joust with you just a bit more. So, just about this credit. You still want the credit. You're saying we really don't have to focus on the credit, but you still want the credit. In so far as it wipes out the 2.9 million, don't you? Yes, I mean, under our interpretation- We do have to get into the credit. I mean, at least in so far as it goes to that. I think the credit follows from how you decide the protest period and how you decide the adjoining lands issue. The credit is just a mathematical calculation that follows from those determinations of how to read the contract. If we- I'm sorry. If we were to decide the 6D issue in favor, in your favor, my understanding is you're agreeing that even under the adjoining lands definition that the opposing side offers, you still would not owe anything. That's correct. And so, do we need to reach that adjoining lands issue? So, for 2020, no advanced royalty would be owed. There is a request for declaratory relief in the complaint, and the definition of adjoining lands would matter for how the advanced royalty calculation would operate going into the future for periods after 2015. Would Wildcat be entitled to challenge the underlying data going back to 1986 for purposes of the advanced royalty credit? No, that's how Section 6D operates. Section 6D would have no purpose if they could, at any point in, say, 2025, challenge the production data for 1986 to 1990. Now, they can challenge what's happened since 2015. I'll give you a little rebuttal time, but how does that follow if, based on Judge Carson's question, you're entitled to go back and recreate the credit, which doesn't sound like it was an ongoing accounting method, but Wildcat's not entitled to challenge that underlying math? We're not entitled to go back and change the credit for prior years, just as we're not allowed to go back and change the coal production for prior years. And all we're asking, just to be clear, and I'm sorry if my answers to Judge Carson were not as clear as they could have been, what we're asking be conclusively presumed true and correct are the figures used for adjoining lands during, from 1986 to 2015. Okay, can I ask you one more question? So this has to do with your textual argument, or actually it's not very textual, about what is adjoining lands, how you want to limit adjoining lands to contiguous state or federal lands, right? But there's no textual, I mean, actually you do have some argument about how you think it's textual, but if, at the time that the nine mile lease was entered into, there were no additional private lands that had been leased. And so, I mean, doesn't that make a difference when we're looking at this text? You say, well, there were only state and federal lands, so that's all we could have been talking about. But it's contemplating future acquisitions. And at the time you entered the lease, there were no private acquisitions yet. Those came in the future. So isn't there a good argument that the text anticipates these private lands coming in under this? No, Your Honor, I think it actually points the other way, because all of the surrounding private lands were owned by the lesser at that time, and have always since been owned by the lesser. And so the purpose of the advanced royalty is to give the lesser compensation if Bridger focuses mining on lands not owned by the lesser, in other words, government lands. If, so if the lesser owns the lands, and those lands later come into the mine, or become mined, the lesser can negotiate at that time the terms of production royalties for those new leases. And that's what happened with the 10 mile, section 11, section 25. If the lesser sold the land to private parties, wouldn't that still anticipate those being considered adjoining lands? Sorry, Your Honor, I missed the beginning of your question. If the lesser sold some of those lands to a private entity. There's no reason to think that in 1986, RSRC was anticipating that it was going to sell some of the lands, that they would then later come into production, and that it wanted to account for those in the lease. There's just no evidence of that, and there's no reason to believe that they wouldn't have assumed that the status quo ante would continue forward, and drafted the lease accordingly. And then before you sit down, why doesn't the nine mile lease encompass underground mining? Why wouldn't that be attributable to that lease? A couple of reasons, Your Honor. There's nothing in the nine mile lease that authorizes underground mining. I know it refers to subsurface mining, but subsurface mining, or subsurface activities, subsurface activities are different than underground mining. In fact, if you look at the 1969 lease, which forbids underground mining, it allows subsurface activities in support of surface mining, which is the same kind of language that you see in the nine mile lease. Beyond that, you have the course of performance of the parties, where they never did underground mining under the nine mile lease, and they always considered underground mining to be outside of the nine mile lease, and that's why they had to enter into a new lease to authorize underground mining. And when did the 10 mile lease authorize? The 10 mile lease was executed in 2003. All right, we ate into your rebuttal time. We apologize for that. I'll give you a minute. Thank you, Your Honor. Let's hear from Wildcat. Good morning, and may it please the court, Leslie Bruckner for Appelli Wildcat Cole. To resolve this case, the court need not, and indeed may not, look further than the plain language of the nine mile lease, which is clear both as to the definition of adjoining lands, and as to the availability of the section 6D relief that Wildcat, excuse me, that Bridger only raised after the district court had not only found summering judgment, but then amended its order in response to our motion. That made total sense, because this was the district court's idea. That Sua Sponte came up with this concept, and how would they have had any opportunity to anticipate that the district court was going to do this in ruling on summary judgment? I disagree, Your Honor, that the district court, Sua Sponte, came up with this concept of having Bridger recalculate its compliance with the 45% projection threshold based on the new correct definition of adjoining lands. Going back? Because Bridger itself has been. To the beginning of the contract? It was Bridger's position, which we opposed in the district court, that for purposes of determining compliance with the 45% threshold, Bridger was entitled to go back to the beginning of the lease in 1986, and we said that was incorrect, but the district court agreed with Bridger. We ruled against you on that. And given that position, it made perfect sense that when the district court agreed with us as to the definition of adjoining lands, it was only fair and correct that Bridger be required to recalculate. Bridger has to have. Stop, stop, stop. Yes, Your Honor. We're talking about section 6D here. We are. And the fact that the district court, on its own, made this determination, neither party had an opportunity to argue about 6D, which clearly may have some impact here. And when it was raised, the district court just said, yeah, no, I don't think that's really relevant, and didn't even have you all file a response. So there's just nothing here. With respect to 6D argument. With respect, Your Honor, I strongly disagree that Bridger didn't have an opportunity to talk about section 6D. It can and should have raised it. Let's go on past the, unless the judge has a question. Yes, Your Honor. Let's get past the waiver argument. Let's get past the waiver argument. I was just going to suggest that, Your Honor. Thank you. So assuming the argument was not waived, the argument lacks merit, because section 6D was never triggered in this case. Now, as some of the judge's questions revealed, and Bridger admits, there were no advanced royalty payments made in this case prior to 2021. Now, let's look at the language of section 6D. It's triggered by a royalty payment. And it says, in particular, and I'm reading from the appendix at 39 to 40, acceptance of any royalty payment under this lease shall not prejudice the right of lessor to protest or question the correctness thereof, provided, however, each such payment made to lessor or any statement or accounting in support thereof shall be presumed conclusively to be true and correct unless the lessor objects. Well, there was no statement made. There was no statement made or statements or accountings made in support of an advanced royalty payment, because there never was one. Now, Mr. Nagel, Your Honor, if I just may. Let me ask the question. Please, yes. We did hear that there was, that the parties made this decision together every five years. This was an agreed upon process, whether advanced royalty payments were due. The data was provided. Everybody had to agree to it, and you moved on. Why isn't that exactly what section 6D anticipates? You've got to have some finality. First of all, Your Honor, there's nothing in the record to actually support that contention aside from the self-serving statements and affidavits provided by Bridger. We asked Bridger to provide any information they had in their possession to support their contentions. Well, again, let's assume that they didn't have an opportunity to raise this issue. So the time that they raised it was after the district court's finding saying you can go back to the beginning, and they say, wait a minute, what about 6D? And the district court said, I don't need to hear about that from you all. So we don't have any briefing or any argument about 6D. Bridger had ample opportunity and, indeed, the obligation to produce information to show what the course of dealing was between the parties. And they submitted those affidavits not just, they cite those affidavits not just in support of their 6D argument. They cite those affidavits in support of their argument that the course of dealing supports Bridger's interpretation of adjoining lands. And we asked Bridger for information to support, if there's any documents in the record to support their course of dealing arguments, that's at app 794 is our specific discovery request. And Bridger produced nothing. I also want to just point out, Your Honor, that the Nagel affidavit, which is the centerpiece of Bridger's defense, section 6D defense, and also the centerpiece of its course of dealing argument, he stated that, during my time administering the nine-mile lease until my retirement, Bridger Cole exceeded the 45% production obligation. So there was no time at which the advance royalty calculation under section 6 was triggered or was required to be computed. I, therefore, did not have reason to focus on the calculation of the advance royalty under section 6. That is Bridger's undisputed testimony. So Bridger's statement. Let me ask you a question about what your client got from Bridger, or your client's predecessor. Did they receive a statement showing how much was mined off of the nine-mile lease? We have no idea, Your Honor, because we requested that information in discovery. And Bridger never produced anything. So but in your own documents, you don't have that. No, Your Honor, not to my knowledge. If I may, I'd just like to, before my time runs out, I would like to, if I may, and if Judge Moritz has no further questions about the section 60 argument, briefly go back to the other issue in the case, which is adjoining lands. And Judge Carson. Before you move off 60, I'm sorry to impede your argument. But if Wildcat received a royalty payment, regular royalty payment, and there was no advanced royalty provided, it seems to me that that presumes that Bridger had done an underlying analysis of the coal mined outside the lease and made a determination that the 45% threshold was not met. And so doesn't the regular royalty implicitly decide that there was no excess mining on those lands? And couldn't Wildcat have objected to that determination as a part of its due diligence in receiving a payment, say, well, maybe we need to confirm the accuracy of Bridger's calculation on off-site mining? Wouldn't that be part of your 60 obligation here? So first of all, just in turning to the actual facts of what happened here, Wildcat did object to the non-payment of advanced royalties in 2021. I take it what Your Honor is asking is, can't we infer from the fact that Anadarko supposedly never protested to the non-payment of advanced royalties that it must have gone and looked at the figures and concluded that they were correct? Or it chose not to. And chose not to? Your Honor, we asked for information to support this in discovery, and we received nothing. All we received was this after-the-fact affidavit from Harry Nagel, who didn't even come on the scene until the year 2000. Well, does that matter if there's a 36-month statute of limitations? Regardless of who did what, if Wildcat had an obligation to challenge the accounting and never did so within the 36 months, doesn't 6D then control? No, Your Honor. And I think, again, it's the plain language that has to govern here. And the language of 6D, just as the language of the adjoining lands provision, in our view, is crystal clear. It's only triggered by an actual royalty payment and a statement or accounting provided in support thereof. And because it's undisputed that the only royalty payments that Bridger ever made to Wildcat's predecessor were production royalty payments, the only statements or accountings required in support thereof were statements or accountings as to the actual production on Rock Springs lands. Anadarko may, for all we know, have just taken Bridger's word for the fact that it didn't violate the 45% threshold. We don't know what actually went on between the parties, because there's no record on this point. Well, if they did, after three years, it's too late. They have to live with it. Because the 45% threshold is relevant to the royalty calculation. Yes, Your Honor, but the operative term word there in your question was if. And if Bridger wanted to advance this argument and had an obligation to support it with actual record evidence in the record, which it did not. So is your argument basically that either of these parties, regardless of 60 and what he says, they can either one challenge ad infinitum, 30 years from now, they can challenge the 20, whatever, 2015 or the whatever they want, if they didn't object to it back then, the 36 months is meaningless, and 30, 50, 75 years from now, they could say, hey, you know, that wasn't the correct calculation of adjoining lands back 50 years ago. I'm going to go ahead and challenge that now. Is that your position? No. Because it seems to be. No, Your Honor, I think. 36 months seems meaningless here. I think that, no, Your Honor, I could see that that seems a bridge too far. But in this case, what we have is a unique circumstance where the court, where we have a district court, I would say that because the district court here ruled, and it's a ruling we didn't challenge, but it was the district court agreed with Bridger that it was entitled to go back to the beginning of the lease. And that opens the door for the purposes of adjudicating the proper amount of damages due for the period from 1986 to the present. That opens up every five year period for just a recalculation of adjoining lands. I'm not saying. That is a totally different issue than whether you can go back to the beginning of the lease to recalculate royalties that you now say should have been paid 30 years ago. That's a totally different issue than what the district court ruled in Bridger's favor on. I'm not. I apologize, Your Honor, if I'm not understanding your question. I think our position here is that, in light of the district court's ruling, it was entirely proper, notwithstanding Section 6D, for the court to order Bridger to recalculate its compliance with the 45% production threshold based on the proper definition of adjoining lands. We are not arguing that we're entitled to go back and nitpick over everything that Bridger ever said about its volumes of production back towards the beginning of time. But this case does present a unique circumstance. If I may just very briefly, before I run out of time, say a word about. Let me ask you a question about the underground coal. And I'm going to probably get the precise language used wrong, but something in the 10-mile lease says that the 10-mile lease is going to govern underground mining, and the nine-mile lease is going to govern surface mining, for lack of a better term. Yes, Your Honor, that's Section 26. How do we deal with that? Because it seems like that suggests that the underground mining is not governed by the nine-mile lease, especially when you consider there's overlap between the lands in the nine-mile and the 10-mile lease. Your Honor, our position is that Section 26 merely clarifies that the terms of the nine-mile lease will govern surface mining in the area above the 10-mile lease premises. In other words, the royalty provisions and so forth, and the adjoining land provision in the nine-mile lease were governed in the surface area. And then the 10-mile lease will govern underground mining on the premises beneath. So the 10-mile lease had different royalty provisions, all kinds of different provisions. It even had a different adjoining land provision. But there's nothing in Section 26 that indicates that, by virtue of the fact that there's a new lease for the 10-mile rim, that somehow that wipes out the adjoining lands provision in the nine-mile lease, or somehow inserts an exception that's not supported by the plain language of the lease. I mean, the language you just read to me suggests the opposite, I think, that the 10-mile lease is going to, if it's happening underground, it's going to be controlled by the 10-mile lease. And like you said, it has a different adjoining lands or definition and everything else. So if it gelled with the nine-mile lease's adjoining lands provision, why would they have even needed an adjoining lands provision in the 10-mile lease? Well, the adjoining lands provision in the 10-mile lease serves a very different purpose. It basically doesn't have anything to do with what's contiguous or not contiguous to Rock Springs lands. What it does is it has to do with a promise that the lessee makes to the lessor that it will indemnify the lessor for any damage to the lands that the lessor is mining and any adjoining properties. So it does have its own adjoining lands provision, but it's a very different kind of adjoining lands provision. I think maybe another way to answer your question. Well, let me ask you another question. So you say it has a different royalty? My understanding is that's correct. Or it may be that at the time it was written, it was different and then it became the same. I apologize, Your Honor. I apologize. The record will show this, but assume that it does. I mean, if it has a different royalty provision, I mean, doesn't that suggest that it was intended to supplant the royalty provision from the nine-mile lease? No, Your Honor. So this brings me back. They could arguably be paying a double royalty to the same people. So the double royalty argument, Your Honor, is a red herring because it's not a double royalty. An advance royalty is a payment that can be recouped by Bridger, first of all. And Bridger is the master of its own destiny. Bridger fails to mine at least 45%. It has to pay an advance royalty. It can recoup that later in the lease. What if the nine-mile lease is out of coal? I mean, I think your opposing counsel would say, listen, this nine-mile lease is old. It's playing out. That's why we're moving away from it. I heard that that's what they. Presumably, that might never be recovered. I heard my predecessor say that there's absolutely nothing in the record to support his contention that the nine-mile lease is running out of coal. It isn't. But the other answer to Your Honor's question, and this brings me back to the point I kept trying to make, and I'm hoping I can make before I sit down, which is that the plain language of the adjoining lends provision governs here with regard to both the 10-mile lease and the Section 11 lease and the Section 25-mile lease. And the plain language says that adjoining lands include any adjoining lands that are contiguous to Rock Springs that are acquired by the lessee after 1986. And there's nothing in any of these subsequent leases that purports to override that. And I would just say, and this is the point I've been trying to make, and I hope to get it out, even though I'm out of my time. You can make the point, because we took your time. Judge Carson, I think you asked exactly the right question when you said, to get to the context, to consider all of Bridger's so-called evidence about course of dealing, do we need to have some kind of ambiguity? The answer is unquestionably yes. And that is, you need to look no further than Bridger's own cited cases, M&M Auto, the Hickman case. I would urge the court to take a look at Hickman versus Taylor. Hickman makes clear that where a lease is unambiguous, as this one is, the only thing a court can consider is surrounding circumstances, which involves the setting at the time the lease was negotiated, and certain narrow things about the parties, their relationship, their relative sophistication, and whether they were actually supported by counsel. There is not a single case cited by Bridger, or anywhere in the law books that I can find, that supports the proposition that you can consider course of dealing evidence to somehow override or construe the otherwise unambiguous provisions of a lease. And with that, I thank the court for your indulgence. You're welcome. And we give a minute to Mr. Yount. Thank you, Your Honor. I'd like to speak very quickly to the record regarding what was given to Anadarko RSRC. If you look at paragraph 10 of Harry Nagel's affidavit, you'll see that it says, in my capacity as manager of minerals for Anadarko, I was personally involved in the periodic audits of the coal production and royalty calculation data provided by Bridger to Anadarko. Anadarko carefully audited production and royalty information provided by Bridger Coal. During those audits, Anadarko treated the adjoining lands as state and federal coal leases within the nine-mile lease surface operation land. I think that is all the evidence that's necessary to conclude that the protest period was triggered. So that could be true. OK, a little different point talking about the protest period. Do you stand on that affidavit for us to determine what the meaning of adjoining lands is? I think it is part of the mosaic of evidence, but I would certainly start with the text as we're required to do. If you look at recital three, the language that precedes the any contiguous leases all refers to state and federal lands. And under ordinary principle of contract interpretation, it should limit that later catch-all. And then you have section 15, which refers to surrendering leases to the government, surrendering all leases on the adjoining lands to the government. But there were no private adjoining lands at that time. But it says that all leases on adjoining lands can be surrendered to the government. And so there's no exception for the later possibility that there would be. It specifically contemplates further acquisitions of federal, state, and private lands, doesn't it? No, it does not specifically contemplate that, Your Honor. There's no reference to purchases or later-acquired private leases being part of adjoining lands. There's no express reference to that. Let me conclude with two other points. One is, in section six, there is an audit right that precedes the protest period provision. That's what makes the three-year look-back period operative, is the fact that Anadarko and RSRC could and did come in and audit these figures. And that was their opportunity to look. They can't now re-audit them 20-plus years later. And finally, Your Honors, I would just say, on the ambiguity point, the M&M Auto case absolutely looked to extrinsic evidence, of course, of performance in determining the plain meaning of the contract at issue in that case. And finally, if the Court is of the view that the contract does not unambiguously support our reading of the adjoining lands provision, we would submit that it certainly does not unambiguously support Wildcat's reading. And therefore, we're in the world of ambiguity. It's appropriate to look to all the extrinsic evidence, which all points towards our reading and warrants judgment in favor of Bridger. Thank you, Your Honors. All right. Thank you, counsel. We appreciate the arguments. Case is submitted. And counsel are excused.